# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE DIVISION

| | | |
|---|---|---|
| **MINACE GASPARD** | * | **CIVIL ACTION NO. 11-0720** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993.  Minace Gaspard, born June 6, 1962, filed applications for a period of disability, disability insurance benefits, and supplemental security income on September 29, 2008, alleging disability as of September 15, 2004, due to back problems and a right shoulder injury.[1]

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's decision of non-disability.

---

[1]Claimant acknowledges that his alleged onset date should be amended to October 6, 2006.

In fulfillment of Fed. R. Civ. P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is not supported by substantial evidence, based on the following:

**(1) Records from University Medical Center ("UMC") dated May 18, 2005 to January 2, 2007**.  On May 18, 2005, claimant complained of neck, left leg, and right arm pain after a motor vehicle accident two days prior.  (Tr. 304). X-rays of the left knee and right forearm were normal.  (Tr. 301-02).  Cervical spine x-rays showed straightening of the cervical spine with loss of the normal lordotic curve.  (Tr. 300).

The assessment was muscle spasm due to trauma.  Claimant was prescribed Flexeril and Motrin.  (Tr. 305).

On August 5, 2006, complainant complained of back pain for six days with no recent injury.  (Tr. 295-97).  He had positive spasms on back examination.  (Tr. 297).  Lumbar spine x-rays showed mild degenerative changes.  (Tr. 294).  The assessment was back pain.  (Tr. 297).

An MRI of the lumbar spine dated October 14, 2006, showed degenerative disk protrusions at L4-5, L5-S1 without overt nerve root compression.  (Tr. 289).

**(2) Records from Dr. Michel Heard dated October 21, 2004 to April 24, 2007**.  On November 30, 2004, claimant complained of right shoulder and arm pain

2

following an occupational injury on August 13, 2004.  (Tr. 329).  He reported that he had last worked on November 19, 2004, when he was fired for failing to fulfill his job requirements.

On examination, claimant was tender over the right A/C and over the biceps insertion, and had pain on rotation.  X-rays were normal, but showed a possible mild increase uptake about the right shoulder.  (Tr. 330-34).  Dr. Heard's impression was post-traumatic right shoulder and arm pain.  (Tr. 330).  He stated that claimant was unable to perform his job as a machine operator.

On January 10, 2005, Dr. Heard reported that an MRI of the right elbow was within normal limits, and an MRI of the right shoulder showed no rotator cuff tear or lateral tear.  (Tr. 325).  His impression was strain/contusion of the right shoulder and elbow.  He recommended conservative treatment.  He opined that claimant was approved for light and sedentary activities as tolerated, but remained unable to work medium, heavy, very heavy, or work involving overhead use of the right upper extremity.  He remained unable to work on February 10.  (Tr. 324).

Claimant continued to have right shoulder pain, and was given injections. (Tr. 316, 318-19).  He was prescribed Ultram and Celebrex.  (Tr. 314).  He was approved for light and sedentary daily living activities as tolerated with no overhead lifting.  (Tr. 313-14).  The impression was right shoulder tendonitis over

3

the bicipital tendon.  (Tr. 313). He was referred to Dr. Schutte.

On March 1, 2006, Dr. Heard reported that claimant had a second medical opinion with Dr. Schutte, who also found that claimant had shoulder tendonitis, and recommended no excessive overhead lifting of the right shoulder.  (Tr. 311). Dr. Heard approved claimant for light and sedentary daily living activities as tolerated, but stated that he remained unable to work medium, heavy, and very heavy duty with no overhead lifting of the right shoulder.

On May 17, 2006, claimant was prescribed Celebrex, and instructed in a self-exercise program.  (Tr. 310).  No overhead lifting was recommended.  He received injections on April 3 and 24, 2007.  (Tr. 308-09).

**(3) Records from Dr. Mark McDonnell dated August 7, 2006 to August 28, 2008**.  On January 24, 2007, claimant complained of back pain after a motor vehicle accident on September 5, 2006.  (Tr. 353).  He complained of back pain around the waist, especially into the right waist area.  He reported that he could lift light to medium weights if they were conveniently positioned; could not walk more than one-quarter of a mile; could not sit or stand for more than one half-hour; could sleep only by using sleeping pills and/or painkillers, and was restricted to trips of less than one hour.

4

On examination, claimant had moderate difficulty rolling over on the exam table and getting up and down because of pain.  (Tr. 354).  He did not appear depressed.  Palpation of the lumbar spine showed moderate to severe tenderness and muscle spasm around L3.  Motor testing and reflexes were normal.  Sensory exam was normal.

Claimant had loss of range of motion in the lumbar spine, 25% in flexion and extension, and right and left tilt.  Straight leg raise was positive bilaterally for back pain.  Sacroiliac and femoral stretch tests were negative. He had no atrophy, and good pulse intensity bilaterally.

X-rays showed decreased disc space height at L4-5 and L5-S1, no instability, some traction spurs at L4-5, a marginal osteophyte at L3-4, and possible slight retrolisthesis at L5-S1.  Lumbar MRI showed dessication at L4-5 and L5-S1, a high intensity zone at L4-5, and protrusions at both levels with no overt nerve root compression.  (Tr. 354, 376).

The impression was a central disc herniation at L4-5 and L5-S1.  (Tr. 354). Dr. McDonnell recommended lumbar epidural steroid injections.  (Tr. 355, 374, 375).

On March 1, 2007, claimant was still taking Lortab, Soma, and Xanax.  (Tr. 372).  He had partial relief after two injections.  He was working very light duty at

5

work, but was unable to do that without medication.

Examination showed severe muscle spasm and tenderness in the lower lumbar spine.  He was still motor intact.  Straight leg raising caused back pain only.

Dr. McDonnell recommended that claimant discontinue all of his medications and return in one month.  On May 30, 2007, Dr. McDonnell noted that claimant had tried to get off of his medications, but his pain was unbearable.  (Tr. 370).  He stated that it sounded like claimant's problem was more of a permanent nature.

On August 28, 2008, claimant was taking Lortab 10, Xanax, and Soma from Dr. Kimball.  (Tr. 365).  He got partial relief from those medicines.  He believed that he was worse, and complained of 6 out of 10 low back pain at rest which radiated into both hips and into the right posterior leg.  He had a sitting intolerance.

Examination showed negative straight leg raising.  Motor was intact. Claimant had severe tenderness and muscle spasm in the lower lumbar paraspinals. Claimant was to return as needed.

**(4) Records from Dr. Baylen Kimball dated August 7, 2006 to July 20, 2009**.  On November 20, 2006, claimant was seen for lumbar pain with radiation into the lower extremities.  (Tr. 520).  He reported his pain as 7/10.  On

6

examination, he had back spasms.  The assessment was chronic lumbar pain, for which he was prescribed Lortab, Soma, and Valium.  (Tr. 519-20).

On March 7, 2007, Dr. Kimball switched claimant from Valium to Xanax. (Tr. 509-10).  He continued to see claimant monthly for chronic pain syndrome. (Tr. 493-509).

On December 10, 2007, Dr. Kimball noted that claimant's pain had been relieved by 60 percent during the previous week.  (Tr. 490).  Claimant reported that Lortab made him itch, but no other side effects.  Medication was continued.  (Tr. 491).  Dr. Kimball's diagnoses were degenerative lumbar disc disease and neuraxial pain due to annular tear.  (Tr. 488).

On January 9, 2008, claimant reported that his pain had been relieved by 80 percent during the previous week.  (Tr. 485).  He did not complain of any side effects.  His pain relief for the next few months  ranged from 60 to 80 percent.  (Tr. 452-82).

On May 26, 2008, Dr. Kimball reported that claimant's pain was well-controlled.  (Tr. 466).  Claimant continued to be treated monthly.  (Tr. 576-97).

On July 20, 2009, claimant reported that his pain was relieved by 60 to 70 percent in the previous week.  (Tr. 573).  He complained that physical therapy

increased his pain.[2]  Dr. Kimball prescribed Lortab, Xanax, and Soma.  (Tr. 571).

**(5) Physical Residual Functional Capacity ("RFC") Assessment dated**

**November 11, 2008**.  Dr. Charles Lee assessed claimant with a light RFC.  (Tr.

523).

**(6) Records from Dr. David Muldowny dated August 11, 2009 to**

**September 2, 2009**.  On September 5, 2006, claimant presented with chronic low

back pain radiating across his posterior waistline and down his right leg to the

knee.  (Tr. 558).  He rated his pain as 8 out of 10.

On examination, claimant had pain on axial compression, spinal rotation,

flexion, straight leg raising, toe and heel walking, and tandem gait.  Reflexes were

2+ in the lower extremities.  Sensation was intact.

Based on claimant's examination and diagnostic tests, Dr. Muldowny's

assessment was degenerative disc disease of the lumbar spine.  (Tr. 560).  He

recommended physical therapy.

On August 11, 2009, claimant reported that he was doing so badly that he

was willing to consider surgery.  (Tr.  568).  His previous MRI from 2006 showed

---

[2]Claimant received physical therapy at Rehab Xcel at different periods between November 16, 2006 to July 8, 2009.  (Tr. 230-275; 386-429; 563-64).  Physical therapists qualify as "other sources" under 20 C.F.R. § 404.1513(e) which sources may be considered but are entitled to significantly less weight than "acceptable medical sources."  *Leval v. Commissioner of Social Sec.*, 2012 WL 1123839, *1 (W.D. La. March 13, 2012).

degenerative discs at L4-5 and L5-S1.  Dr. Muldowny recommended an updated MRI.  He determined that claimant was unfit for duty pending further treatment.

A repeat MRI showed disc dessication at L4-5 and L5-S1 with disc narrowing; a very large central protrusion with a large high intensity zone of the posterior annulus at L4-5 centrally, and a small central bulge at L5-S1 with a very small high intensity zone in the inferior aspect of the annulus.  (Tr. 600-01). Claimant was still having a lot of back pain and some leg pain.

Dr. Muldowny recommended decompression and fusion at L4-5 and L5-S1. (Tr. 601).

**(7) Claimant's Administrative Hearing Testimony**.  At the hearing on September 18, 2009, claimant was 47 years old.  (Tr. 36).  He testified that he was 5 feet 11 inches tall, and weighed 160 pounds.  He had a 10th-grade education.

Claimant testified that he had last worked in 2004 as a heavy machine operator.  (Tr. 37).  Prior to that, he worked at a paint and body shop, in sandblasting and painting, in prepping and detailing cars, and as a carpenter helper. (Tr. 38-39).  He had stopped working after he hurt his shoulder in an on-the-job accident.  (Tr. 39).  He said that he had settled his worker's compensation claim for $30,000.00 after two years.  (Tr. 40, 45).

Regarding complaints, claimant reported that he was in a car wreck in 2006. (Tr. 45, 49).  He stated that he had low back pain which sometimes extended down his legs.  (Tr. 40).  He complained that his back pain occurred once or twice a week, and lasted two or three days at a time with spasms.  (Tr. 46).  He testified that he had leg pain once or twice a month.

Additionally, claimant said that doing too much activity, including physical therapy, aggravated the pain.  (Tr. 40).  He testified that his doctors had recommended surgery, and that he thought that he was going to have it.  (Tr. 47-48).  He stated that the insurance company had sent him to a psychiatrist, but he was not getting any treatment for depression.  (Tr. 50).

As to activities, claimant testified that he did a little laundry and cooking. (Tr. 40).  He said that he went grocery shopping and took out the garbage.  He visited with friends and relatives occasionally, and went to church.  (Tr. 41).

Additionally, claimant watched TV and listened to the radio.  He walked around the park for a couple of miles.  He was able to drive.  (Tr. 42).

Claimant reported that his medication helped him sleep.  He complained that his medication made him drowsy.  (Tr. 43).  He saw Dr. Kimball once a month. (Tr. 42).

Regarding restrictions, claimant testified that he could stand about 20 to 30 minutes before having to sit down.  (Tr. 43).  He stated that he could sit for 20 to 30 minutes before having to stand.  He said that he could lift 20 pounds.  He did not report any problems with using his hands or getting along with people.  (Tr. 44).

**(8) Administrative Hearing Testimony of Wendy P. Klamm, Vocational Expert ("VE")**.  Ms. Klamm described claimant's past work as a heavy equipment operator as medium and skilled; an auto body repairer helper as medium and unskilled; a spray painter as medium and semi-skilled; a sandblaster painter as medium and semi-skilled; an automobile detailer as medium and unskilled, and a construction worker as heavy and semi-skilled.  (Tr. 51-52).  She testified that he did not possess any transferable skills to sedentary work with those jobs.  (Tr. 52).

The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education, and vocational experience, who was limited to sedentary work with a sit/stand option at least once an hour.  (Tr. 52).  In response, Ms. Klamm testified that he could not return to his past work.  However, she stated that he could work as a sorter, a sedentary, semi-skilled job, of which there were 2,465 jobs statewide and 143,665 nationally; check cashier, a sedentary, semi-skilled job, of which there were 15,735 jobs statewide and 848,625 nationally, and

telephone solicitor, a sedentary, semi-skilled job, of which there were 2,095 jobs statewide and 149,575 nationally.  (Tr. 53).

When the ALJ changed the hypothetical to assume that claimant would miss work on an irregular basis at least three days a month, Ms. Klamm testified that no jobs would be available.

**(9) The ALJ's Findings**.  Claimant argues that: (1) the ALJ erred in finding that he could perform sedentary, semi-skilled work despite having no transferable skills; (2) the ALJ erred in finding that claimant could perform sedentary, semi-skilled work despite having only a limited education; (3) the ALJ erred in finding that transferable skills were immaterial to his decision; (4) the ALJ premised his decision on flawed vocational expert testimony, and (5) the ALJ therefore failed to meet his burden of proof and his decision is not supported by substantial evidence.

Because I find that the ALJ failed to properly consider the side effects from claimant's medications, and improperly found that claimant had the residual functional capacity to perform the semi-skilled jobs identified by the vocational expert when he was limited to unskilled work, I recommend that this matter be **REVERSED** and that the claimant be awarded benefits as of his amended onset date, October 6, 2006.

In the Decision, the ALJ noted that claimant took pain medication which helped relieve his low back pain, but caused him to be drowsy.  (Tr. 24).  The record reflects that claimant was taking Lortab, Soma, and Xanax.  (Tr. 365, 571).  Lortab is a narcotic medication used to treat moderate to moderately severe pain.  Xanax is an anti-anxiety medication.  Among the common side effects of these drugs, particularly Lortab, is drowsiness.

Under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms."  *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (citing 20 C.F.R. § 404.1529(c)(3)(iv)).  Although the ALJ acknowledged the side effect of drowsiness from claimant's medication, he failed to include it in his hypothetical to the vocational expert.

In *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994), the court held that "unless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions . . . a determination of non-disability based on such a defective question cannot stand."  Thus, the ALJ's

failure to include the side effects from claimant's medication in the hypothetical to the VE was error.

Ordinarily, the Court would recommend that this matter be remanded for consideration of the effects of the medication on claimant's work capacity and his ability to maintain employment. However, the ALJ also erred in finding that claimant could perform the semi-skilled jobs identified by the vocational expert. (Tr. 29).  The ALJ determined that claimant did not have the residual functional capacity to perform the full range of sedentary work.  (Tr. 29).  He wrote that "To determine the extent to which these limitations [the claimant's ability to perform the requirements of sedentary work has been impeded by additional limitations] erode the *unskilled* sedentary occupational base,  the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity as outlined above."  (emphasis added).  So, the ALJ was looking to the VE for occupations in the *unskilled* sedentary occupational base.

In responding to the ALJ's hypothetical, the vocational expert identified three occupations – sorter, check cashier, and telephone solicitor – all of which are *semi-skilled*, not *unskilled*.  (Tr. 53).  The ALJ specifically found in the Findings of Fact and Conclusions of Law that claimant had a limited education (Tr. 28), which,

14

under the Social Security Regulations, means "ability in reasoning, arithmetic, and language skills, *but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs*."  (emphasis added).  20 C.F.R. § 404.1564(b)(3).  The regulation further states that: "We generally consider that a *7th grade through the 11th grade level of formal education is a limited education*."  (emphasis added).  Claimant testified that he attended school through the 10th grade, which is considered to be a limited education.  (Tr. 36).

Despite the ALJ's own finding that claimant had a limited education, he still relied on the three semi-skilled jobs identified by the vocational expert in determining that claimant was capable of making a successful adjustment to other work that existed in significant numbers.  However, the ALJ held that claimant was unskilled.  There is no evidence in the record of *any* jobs available to claimant in an unskilled sedentary base, the base that the ALJ held claimant to occupy.

Finally, the vocational expert testified that claimant did not possess any transferable skills from his past relevant work to sedentary work.  (Tr. 52).  The only jobs identified by the VE were semi-skilled jobs, which claimant could not perform based on the ALJ's own finding.  Because no evidence exists in this record that other work exists in significant numbers in the national economy that

claimant can do, the ALJ determination is erroneous.

Accordingly, the undersigned recommends that the Commissioner's decision be **REVERSED**, and that the claimant be awarded appropriate benefits as of the amended onset date, October 6, 2006.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT,**

**EXCEPT UPON GROUNDS OF PLAIN ERROR.  DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION, 79 F.3D 1415 (5TH CIR. 1996).**

Signed October 9, 2012, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

17